Good morning, Your Honors. My name is Ellen Durkee, Counsel for the Federal Defendants. My intention today is to reserve three minutes for Mr. Morgan and five minutes for rebuttal. We are here today, of course, on a grant of a motion for injunctive relief under the Endangered Species Act. The District Court committed legal errors and abused its discretion in spring spill and earlier monitoring during the final year of implementation of a 10-year biological opinion that has substantially improved conditions for salmon. Injunctive relief is an extraordinary remedy not available as a matter of right whenever a court finds a legal violation. And overlaying this precept and the requirements for injunctive relief is the Administrative Procedure Act. And a bedrock principle under the Administrative Procedures Act is that a court's proper role is not to take control of administrative programs or conduct experiments just because the court thinks it might yield useful information or be better. So today I'd like to start with and focus on the merits of the injunction. But, of course, there is a, you know, threshold Rule 60B issue that, you know, if time allows, I'll come back to it. If there are questions, of course, I would be happy to answer those. With respect to the injunction, I want to start with three main points about the injunction, and then we'll see where the argument takes us. But the first one are the legal errors that the District Court committed in its inquiry into irreparable harm. The District Court said the limited duration of an interim injunction is not relevant and that any magnitude of harm is sufficient for an injunction. And in both respects, that is wrong as a matter of law. It is absolutely relevant that this is an injunction only for an interim period and really just this one season before the court required a new biological opinion that will address the deficiencies that the court had found in the biological opinion. In that respect, it is akin to like a preliminary injunction hearing in terms of the duration where the court's asking, is there going to be irreparable harm during the time period in which the legal proceedings will be over? And then the other, the any magnitude is really getting at the next point I wanted to make, is that the court really made a perfunctory analysis and just a conclusory relate on very conclusory statements to find irreparable harm. The court did not execute to place that statement in context of the entire litigation? Yes. And I think that's we would welcome putting it into context. How can you dismiss it just as a summary, conclusory statement? Well, because I mean, there was a basis for it. Well, what we would say is the court didn't look at the current record. What the court the basis of it that the court said all were related back to almost decades ago. And if the court had done what we think is required under Winter and under Rule 65, which is the court can't simply say, oh, your reasonable and prudent alternative in 2000 was found to jeopardize, therefore, you know, there's jeopardy from Operation of the Dams. I mean, in the Supreme Court case of Winter, what the court said is the court, the district court erred in that case by only assessing the initial proposal of the agency rather than assessing the proposal with the mitigation conditions that had been added to it. Rule 65, you know, also requires district courts to make findings as to the reasons for finding irreparable harm in the underlying thing. And part of the what what is difficult about what the court did here is that it never makes any reference to the record as it exists now, and it never sort of it never considers the, you know, the significant improvement in juvenile survival under the, you know, the current operations. The third point that I want to make has to do with deference. I recognize in the 2005 decision this Court said, well, there's nothing to give deference to. This case, I think, is very different in that respect, and specifically that what the court has ordered here does not relate sufficiently to the violations that it found in the biological opinion, and on the issues that are most relevant to this injunction, it ruled in favor of the federal defendants. Specifically, one of the Oregon raised as a challenge to the biological opinion, the National Marine Fisheries Service's discussion of latent mortality and its decision not to do what the district court has now ordered it to do. And this discussion is in the 2004 biological opinion, a page in our further excerpts of records, 69 to 73, and also in some other excerpts of record. But those pages of the 2014 biological opinion lay out why NEMS did not think, do any large-scale change in operations based on the evidence that we have, the very same evidence that they're endowed and hypothesis they're relying on now. And instead, it suggested that an experiment that has certain elements into it should be that it should work on devising that, and that it should be considered in the context of developing the 2018 bio. Among those elements, it said it should go through ESA consultation, it should have elements of a rigorous scientific test, it should be reviewed by an independent scientific advisory board. Oregon then did, you know, And the independent scientific advisory board said the same thing. They said, you know, we really can't tell from this data whether it's going to have any benefit or not. It may, it may not. It's a correlative relationship, but that's not causation. And, you know, I assume the courts are aware of what a correlative relationship is, but like one of the famous one was in the 1950s when scientists said there's a correlation between eating ice cream and polio infection rates, and they recommended that people not eat ice cream, and so there's a big drop of ice cream. Well, it turned out that the correlation was because they were both associated with warm weather, exposure rates higher in warm weather, ice cream eatings. So, you know, there's possibilities for false correlations, and there's all sorts of other reasons that could be for this correlation. So rather than doing that, what the court has ordered is exactly sort of what Oregon proposed, which is let's just do it. Let's not design, you know, let's not have a And that's very troubling. And the court, in looking at the latent hypothesis in the district court opinion, said we agree, you know, that it's too uncertain. The court said the service, there's no consensus in the scientific community on this, so defer to the district court correctly, I mean, to the agency on that. Then it just flipped around and said, oh, the best biological, you know, scientific opinion, the same evidence is exactly what they said it wasn't before. So there's these signs that there's just some inconsistency. The other piece of the district court's summary judgment decision is its findings on the substantial improvements in juvenile survival, both in, and this is, you know, and they're rather dramatic. The, you know, in the 2005 decision, this court, you know, talked about the specific species that would be affected by the spill, which, of course, is lacking in this decision. And it pointed out that at that time, only 17% of fall Chinook survived. Now, that's not the species of concern here, but I would point out that it's doing much, much better. But the spring species, the survival rates under the biological opinion implementation have been, you know, in the 50 to 60% range. So to just sort of lump it all as we've decided this before, no reason, there's nothing to inquire in here, we think is fundamentally wrong. And I'm ‑‑ You want to reserve some time? Yeah. Okay. Yeah. No, I think that unless the court has specific questions, I will save for Mr. Save your time for rebuttal and turn it over to your colleague. Good morning. May it please the court, Jason Morgan on behalf of Intervenor Defendant Northwest River Partners. Mr. Kirk, you talked about several reasons, several problems with the injunction order. I want to focus in on one of them, which is specifically the failure of the plaintiffs themselves will be irreparably harmed absent an injunction. The core purpose of injunctive relief as an equitable remedy is to prevent irreparable injury to the applicant. And that's a bedrock requirement of any injunction. And that finding is just not in the injunction order. There is no finding that the plaintiffs themselves will be irreparably injured. It's not there. The closest the court comes is page 12 of the order, footnote 7, where the court says, well, I found that the species are affected and the plants are shown that that will affect them. But a will affect finding isn't a substitute for the required finding that the plaintiffs themselves will be irreparably harmed. And this isn't just a technical oversight here. It flows from sort of the problems with what happened here. The district court here did not look at a situation where it needed to prevent irreparable harm from occurring. It looked at a situation where the plaintiffs presented it with an injunction that said, hey, we think this may make things better. And the district court said, well, this is worth trying. But that's not the same – that's not the role of the district court. The district court's role is not to interject itself into the agency decision-making process or start making scientific determinations about which alternative might or might not be better or which experiments are worth trying. Its goal in the injunction – its role in the injunction context is to prevent irreparable harm. And that didn't happen here. We don't have any finding of irreparable harm to the plaintiffs. And even if you were to collapse, you know, the plaintiffs and the species and say, well, we think there might be irreparable harm to the species. Well, what irreparable harm to the species does this injunction prevent? The injunction – the injunction has to target harms that flow from the conduct that isn't joined. That's how injunctions work. Here, we're talking about an injunction that deals with fist passage flow. Well, that's the one area that the district court, on summary judgment, found the federal defendants got it right. The court evaluated the critical habitat – the critical habitat component under Section 7 of the ESA and found that the reasonable and prudent alternative put in place and its mitigation measures, that the sum result of that was it was not going to adversely modify or destroy critical habitat, including fist passage. So there isn't pending irreparable harm from that – from the status quo. And we know that. And, I mean, one of the best ways to tell whether a plaintiff is irreparably harmed is how quick do they move for relief. Well, not very quick here. We are nine years into a 10-year biological opinion. And if there was irreparable harm occurring from this biological opinion and this spill injunction was the solution for that,  And even, you know, somewhat more ironically, as they're here trying to affirm an injunction order to give them relief from the status quo, they're also back in the district court, as you saw in the 28J letter submitted by the federal defendants, they're back in the district court saying, whatever you do, don't let them change the biological opinion. Leave it in place through 2021. So those two things don't really work together. You can't claim you're irreparably harmed by the status quo under the biological opinion that's been in place for nine years while asking the district court to leave it in place for another three. Those two things simply don't work. So just to simply put, this isn't the situation the court was presented with in 2005, where there was no spill occurring and virtually no mitigation proposed. Here, there's a robust, reasonable, prudent alternative in place, backed by a billion dollars in investments to improve the status quo. The whole purpose of injunctive relief is to prevent irreparable injury, and there was no grounds for district court to intervene in this process. I guess the last thing I would say, I know I said last already, but I'll say it one more time. You're a little over your time, too. Oh, okay. I just wanted to address, quickly, Judge Pius's question about, should we just disregard everything that happened in the past? And I think the answer is, in some sense, yes. We have to disregard holdings that were made based on outdated versions of the law, on the Thomas v. Peterson standard. Yeah, we do have to disregard that. But the record is different now. The record that is before the court, that was before the district court, is fundamentally different now, and the Herb Reid case says you can't just look to a record in a different case. You have to look at the record that's before the court now. So I'll stop there. Okay. Thank you, counsel. Thank you. Good morning. May it please the court, I'm Todd True, representing the National Wildlife Federation plaintiffs. I'll be splitting my time this morning with counsel for the state of Oregon. I'll take 10 minutes to address two issues, whether the district court abused its discretion in finding a likelihood of irreparable harm, and whether it abused its discretion in finding that increased voluntary spring spill up to the level allowed by state water quality standards would reduce that harm. Counsel for Oregon will take 10 minutes to address two additional issues, whether the steps the district court took to ensure a narrowly tailored injunction or an abuse of discretion, and whether Rule 60B bars our motions altogether to the extent the court has questions on that issue. Let me turn to the issue of irreparable harm. This court's decision in Cottonwood sets the standards and provides guidance. And in fact, in that decision, the court cites the 2011 injunction decision in this case to illustrate the point that where the ESA has been violated, as it has here, it should not be an onerous task to show harm to protect the species. And in addition, this court's decision in 2005 affirming a prior injunction also provides guidance here. So let me turn now to the district court's new injunction decision in 2017, because it tracks those two decisions closely. It doesn't simply rely on the fact that the species is listed, and it doesn't simply adopt the earlier findings and stop. We cite many of the district court's findings of harm on page 22 of our brief, and the injunction order itself addresses harm, specifically at pages 11 to 13 and 15 to 18. Among the relevant findings, many of which do refer back to the court's summary judgment decision, which is perfectly appropriate, is that the predicted survival improvements for salmon from the 2014 BiOps RPA have not materialized. That's 184 fed third at 892 to 93, and again at 903 to 908. This is especially relevant as a finding, because the salmon here start from being in jeopardy. That is, the 2008 BiOp finds operation of the dams will cause jeopardy, the RPA is supposed to avoid jeopardy, the RPA failed, and in fact the benefits did not materialize. This court, in its first decision, 422 fed third at 795, relied on a parallel finding of a failure of benefits to appear to support its prior injunction. And in fact, it's worth pointing out here that the district court summary judgment order doesn't find that the biological opinion kind of was a little bit soft around the edges. It is a lengthy opinion that goes to the core of that biological opinion and its analysis. And the point is that RPA failed and the benefits didn't survive. Similarly, the court found, as the district court has in the past, that dam operations are a major source of mortality for juvenile salmon. That's at page 12 of the injunction order. And this court pointed out, in its prior injunction motion, the same thing. And that's beyond dispute. That's again at page 795, 422 fed third. The defendants try to reject that point by arguing that as long as river conditions are a little bit better today than they were yesterday, there can be no irreparable harm. And that position, sort of a glass half-empty problem, it has a glass half-empty problem. Their view is, as long as we add a little bit of water to the glass, so that there's more in there today than there was yesterday, it doesn't matter how much is left to fill. It doesn't matter how much ongoing harm there is. You can't get an injunction. And that approach would basically put injunctive relief out of reach in most ESA cases, as long as the government did a little something to help the species. It's a recipe for a death by a thousand cuts approach. It is not the injunction standard set in Cottonwood. It's not the injunction standard this court applied in 2011, the district court. It's not the standard this court applied in 422 fed third. And the district court went on to talk about the actual impacts of dam operations now, today, on juvenile salmon. That's in the injunction order at page 15 to 18. And it discussed there the findings of the comparative survival study. That's a comprehensive federal state tribal scientific analysis. The results of that study, as they relate to dam operations, are discussed extensively in the declaration of Mr. Ed Bowles. That's RER, starting at page 535, and then his reply declaration at 177. And what he explains is that continued dam operations under the 2014 BIOP will force more juvenile salmon to use powerhouse systems to get past the dams, rather than pass through spill, and that that will increase mortality. That's irreparable harm. That's at RER 553 to 557. The district court's findings of irreparable harm are well supported. They are specific. They don't just rely on the past, although the past is certainly a guide here. And there was no abuse of discretion. Let me turn to two other issues that have come up. First, let me talk for a minute about the idea of injury that has to occur during the remand. In fact, there is injury during the remand here. This spring, when juvenile salmon migrate down the river, under the 2014 BIOP, if they did not have the spill injunction the court has put in place, more of them would die. About 50% die coming down the river, past the dams each year. And the current injunction that increases spill, which is the safest way to get these salmon past the dams, will mitigate that mortality. That is reducing irreparable harm. That is a classically appropriate form of injunctive relief. The court doesn't have to eliminate the harm. And in fact, in its 422 opinion, this court noted that the court faces a situation here where there's ongoing operations, and its choices are somewhat limited. And the best thing it can do is take steps that will reduce the harm. And this spill injunction will do that. So the current impacts of the impact. Does your court express some uncertainty about how much benefit would be derived? I don't think the district court expressed so much uncertainty about whether there would be benefits from increased spill. Or how much. Right. There is evidence in the record of how much. The court didn't cite it. I don't think the court needed to have a precise number to conclude that it would provide benefits. But it's sufficient just to find with an adequate factual or record that there would be benefit. And there is, yes. And that it would reduce the irreparable harm. I don't think, I can't think of a case where an injunction failed because the district court couldn't determine whether the harm would be mitigated by 10% or 20%. If the harm can be mitigated by a step that can be implemented, and especially in a situation like we have here where the species is in jeopardy. The measures to protect it have failed. Then that's an appropriate situation for an injunction under Cottonwood. If you go back, in fact, your honor, and look at the South Yuba decision that the court cited in the Cottonwood, along with this decision. The court there wasn't saying, I know the precise numeric magnitude of improvement that's going to happen if I implement these measures. It said, I can see that there will be some benefit here. But I also think the record here, and it's in the declaration of Mr. Bowles, does give you that information. The CSS study that Mr. Bowles cites extensively and discusses, basically it says the difference between spill under the 2014 biop and spill under the increase in spill. That will reduce by about a third the number of years when we get returns that are below the level needed for survival. And it will increase by about half the number of years when we get returns that are at least at the bare minimum level needed for survival. That's very concrete evidence. That's a very extensive study. Many years, it is not a hypothesis. It's based on data, year after year after year, showing that juvenile salmon survive better if they pass dams by spill. So this is not, in any sense, an experiment. What the district court did is find that spill to the spill cap levels would reduce harm, period. And NOAA actually agrees with that. And again, Mr. Bowles cites in his declaration the long history of NOAA saying that spill cap spill is not harmful to salmon and that spill is better for salmon. In fact, in one of the declarations, NOAA's declarant, Mr. Graves, says, I wholeheartedly agree with Mr. Bowles that more spill is better for salmon. So the idea that this is some kind of make it up experiment is wrong. Where the word experiment comes up is in a different context where Oregon had 25% is the actual number, above the spill cap levels. And one of the scientific boards said, we need to look at that a little further before we implement it. But the spill that we're talking about, at or below spill caps, has been recognized as beneficial to salmon. That's not an experiment. And let me just add that we have the history from this case. We have, in 2011, and Judge Redden observing that, actually the spill that I ordered before has actually improved survival. What we're talking about here is, are we limited to the reduction in harm that Judge Redden ordered, which, by the way, as this court noted, the agency's objected to as an experiment when it was put forward back in 2005. Are we limited to that, or can the court take an additional step and provide further protection for the salmon, particularly where, as here, the measures in the biological opinion, the RPA, that were supposed to protect the salmon, don't comply with the law, and the benefits from those measures haven't appeared. So in sum, I think the court's findings of harm are well supported in the record, detailed and careful. The court had a technical advisor that helped it understand all of these issues. An increased spring spill will reduce the harm the species would otherwise face while the agencies are going about complying with the law, something that they have failed to do for quite some time here. I'm going to turn over the rest of the time to my colleague, Mr. Whitehead. Thank you. Thank you, counsel. May it please the court, counsel, Carson Whitehead for the state of Oregon. As Mr. True suggested, I'd like to talk briefly about two issues. The first being that the injunction ordered by the district court is narrowly tailored, and the second, if the court would like to hear about the rule 60 argument that the federal defendants and other defendants raised. First, on the narrow tailoring, the district court's injunction is absolutely narrowly tailored to provide a remedy for the violations of the Endangered Species Act that the district court found on summary judgment, and specifically, the district court had found that the 2014 biological opinion was flawed because its analysis relied on mitigation that had uncertain benefits that were unlikely to occur, that weren't sufficiently likely to occur, because the biop relied on its analysis of a measure called RS, that refers to recruits per spawner, did not account for how that measure in the biop actually showed that the species were in decline, and because the biological opinion failed to adequately account for the dangers from climate change. The additional spring spill that the district court ordered will remedy all of those violations because it provides an additional survival benefit to the listed species. The factual record is clear, as Mr. True discussed, that additional spill will provide a survival benefit, and that's probably most closely linked to the problem with the biological opinion in how it addressed RS, the measure of recruits per spawner, and that's the technical issue that the summary judgment opinion goes into in detail, but essentially increasing the spill, as detailed in Mr. Boll's declaration, will increase the survival rates for the juvenile salmon, and that's, in turn, associated with an increase in RS. There's a correlation between those two. Then going to the narrow tailoring piece, federal defendants argue at length that the injunction is an experiment, that it somehow overstepped the district court's authority and has invaded the areas of agency expertise, but it absolutely did not. Oregon and NFW asked for this injunction in January of 2017. We asked for the injunction to start in the spring spill season, beginning of April in 2017, and the federal defendants responded that that is too soon. We don't have time to figure out how to increase spill operationally, how to do that safely in terms of human navigation, potentially other unforeseen consequences of additional spill, and the district court took those concerns to heart and said, OK, the benefits of increased spill are in the record. They're amply demonstrated, but the parties need time to figure out, as an operational matter, how to do spill safely and correctly and in the best fashion. And so the court gave the parties a year to figure out how to do that. And that wasn't the district court ordering an experiment to determine whether spill would be beneficial to fish. The court made that finding already in its injunction order. The court was simply mindful of the operational complexities of the FCRPS and gave credence to defendants' concerns that ordering a spill at the requested level too soon could have unintended consequences. And that process has now played out. In January, the district court entered an order that details spill operations for the spring season. The parties worked together in a collaborative process to reach that point. And so the process that the district court ordered has been successful and is the precise sort of narrow tailoring that this court ordered the district court to do in 2005. And so the court was very mindful of the need to keep this injunction narrow, and it did that. Then briefly, I'd like to touch on the Rule 60B issue. Defendants argue that the request for injunctive relief is a request to modify the district court's summary judgment order, and that's incorrect. The summary judgment order is not a final judgment, and the summary judgment order did not purport to govern the issue of spring spill. It didn't purport to govern injunctive relief. That was a separate issue that Oregon pled in its complaint and hadn't been addressed. And as we detail in the briefing, the parties knew that it hadn't been addressed at that time. Oregon and NWF, in the briefing concerning the NEPA remand schedule, specifically said that we were considering asking for injunctive relief and explained the basis for that. And the defendant said, we recognize that the plaintiffs can ask for injunctive relief in the future. Right. But what is this interim injunction? It's a different animal than I think we're used to seeing. It's not a preliminary injunction. So how do we review it? The words interim injunction aren't found in the federal rules. That's right. And what the district court said, it's its own creature, but the standards of review are essentially the same as reviewing a preliminary injunction. And at least with the federal defendants, we had no dispute about the standard of review here, review the factual findings for clear error and the injunctive relief that's ordered for an abuse of discretion. And there's ample evidence in the record to support the district court's factual findings. And as I just discussed, the actual relief ordered, I think, was well within the district court's discretion. Isn't it tantamount to a final injunction for the 10-year period, remand period? So currently, there's only one year left in the 2018 buy-up. And so for that period, this injunction governs just the 2018 spill season. Well, no, the problem in this case, well, it goes on at 10-year increments. It could go on forever. So there'll never be a final judgment. That means nothing's ever final in this case. Isn't that your view? It's not the state's view that nothing is ever final. No, I think the district court has retained jurisdiction. Right, because there'll be another 10-year buy-up. And then after another 10-year buy-up, I assume. Well, but the reason the court's retained jurisdiction is because the buy-up was remanded, because it violated the Endangered Species Act. So I think Oregon and NFW's position is that when the federal government issues a lawful biological opinion. The spill order only applies to 2018. That is correct. There's nothing in place for 2019. That is correct, Your Honor. So for 2019, you'd have to go back to the district court and ask for another injunction. Is that correct? That's correct. Or further relief, or something. Or further relief. This injunction order specifically covers the 2018 spill season only. Any further questions? Nope. I see I'm out of time. Thank you, Counsel. Thank you. Ms. Durkee? Is this the time I have left? Your Honors, I'd like to respond to some of their points. But I want to make sure that the Court understands why all of this matters to us. There are, this case is not just some academic exercise about what a court can do. What the Court has ordered is very different than a prohibitory injunction that says don't go forward with your action while you do the remand. It has ordered very substantial changes in the operations with uncertain benefits from it. The Court has never operated these dams in the way that they are being asked to do now. They're not sure how this is going to go. In the past, they operated, they had parameters for an amount of spill. But now what they're trying to have to obtain is a water quality standard to hit it right on the nose in a 500 mile river. It would be like taking this building and saying, you have to have the temperature the same in every spot in this building, every monitoring spot. But you don't have a thermostat or anything else. You just have to tinker with mechanisms and it's affected by ambient temperatures and so on. It's a very complex thing they're being asked to do here. And there are many, many, many employees behind this that have been engaged in making the spill plan and they will be engaged in trying to implement. This has very real consequences on reordering the agency's priorities. Secondly, the precedent of what the District Court done here is very troubling to us. Because as we know, the plaintiffs intend to have just rolling injunctions and they want to extend the time for the biop. And so what it is inviting is more and more District Court intrusion to do operations that the District Court's not an expert on and they don't go through USA consultation. It undermines the regional forums that Judge Redden encouraged to put in place and that have been generated and are very sophisticated now. Oregon didn't even go to the regional forums to ask for the monitoring. It's going straight to court. And that's an invitation. Everyone's going to forget about the regional forums to discuss this. Just go to the District Court and try to get the operation that you prefer. And finally, this whole issue of the science behind is very troubling too. But let me just quickly hit some points that are responsive to some of the things that Plaintiff's counsel said. It is not our position that a little bit, one fish that's better today than yesterday. No, that's not what we have here. We have substantial, meaningful improvements. We have metrics that no one challenged in this case that show there's a very low risk of extinction in the short term over the next 24 years. All of the concerns that the District Court had with were very long-term, recovery-prong oriented. So there's no imminent harm here. And we're talking about substantial improvements, not one fish. Secondly, they said the benefits have not materialized. Well, what they're focusing on is a place where the District Court talked about a few specific populations on a metric that has to do with recovery prong. And the agency explained why that productivity metric went down for a few years because of the density dependence. There was a lot of abundance, which is good for species. That always brings down productivity because of the density dependence relationship. The comparative survival studies, the court had already earlier said that's not the best scientific data. So now it's gone to being the best scientific data. And they're claiming certain and substantial benefits from this. And I would really implore the court to look at what all the scientists have said about that and how you could possibly say that. It's not enough to have one scientist say that. And frankly, what Mr. Bowles actually said is that it may increase the probabilities. Probability is not certain. That's talking about, you know, over a long time period, if you flip a coin, then you might change the probabilities. That's not certain benefits in the short term. And finally, the point about more spill is always better, and we've agreed with that. That is not the case. That's like saying, you know, if you have a medicine that's beneficial, then it's always good to double the dose. And that's what they're trying to do here. More spill is not always better. And, you know, the probabilities... You know, and that's certainly what our expert said. He did not... You know, he was explaining why this was not necessarily better. So I think it's putting false words in his mouth to say he did that. And in terms of... You know, we appreciate that the court gave time to look into hydraulic patterns, but we're not here complaining about the lack of ability to test for hydraulic patterns. What the court did was cut off the inquiry into whether this is actually beneficial based on the comparative survival study. And cutting that off is part of the problem. And finally, narrowly tailored... Excuse me, when you say whether this was beneficial, you're talking about the spill? Yeah, the ordered spill, yes. I just want to make sure... And then in terms of narrowly tailored, narrowly tailored isn't just about hydraulic patterns. Part and parcel of that, and this is part of our point, is you have to come up with, you know, how much harm is the continued operation causing for this one year versus how much benefit. And the district court didn't engage in all of it. Now, we understand you might not be able to get it with, you know, exact mathematical precision, but they're resting on the idea, and in fact, I think Oregon says it's pretty... Even if it's just a little bit, that's enough. And we would say that's not narrowly tailored. It's not going to do the species as a whole any benefit. This case in, you know, there are billions. The runs of juvenile salmon are in the magnitudes of billions. You can't say that saving a few juvenile salmon really justifies an injunction of the cost that this will be both in terms of, you know, monetary costs to power and impacts on the power system, but also in terms of what the agencies are going to have to do in order to implement this. So we very much appreciate the court hearing this on expedited hearing and considering our position. Thank you. Can I ask a practical question? Yes. You asked for the expedited hearing because sometimes... April 10th, is that the what? The first bill date or something like that? The first, this bill starts on April 3rd and goes through June 15th. So you wanted a decision before then, right? When you asked for the hearing. Has anything changed? That's my question. I know we're, you know, are you still in the same mode? Yes. But... You haven't, I mean, I assume the entire system is gearing up, you know, to be ready to do these bills if you don't prevail in this appeal, right? So they're going ahead with the work. Is that correct? Yes. I mean, they have, you know, put in all the, you know, the procedures and the protocols and so on, but I can assure you that they can go back to doing it the way they have been doing it without as much difficulty as they would like to. We'll have doing this. I mean, the spell continues through June 15th. And I'm, so I, you know, I would urge the court, you know, each day this goes on, it's problematic for us. So if the court's unable to, you know, make a decision by April 3rd and we would still very much appreciate. But still. A decision. The sooner the better for you. Yes. All right. Thank you. We'll do what we can. Thank you all for your briefing, your arguments today have been very helpful to the court and we'll be in recess. Thank you.
judges: Tashima, Thomas, Paez